(R.D. 11177)

GENERAL WOOL CO., INC., ET AL. v. UNITED STATES

Entry No. 10113, etc.

(Decided June 1, 1966)

*Behrstock and Rudnick* (*Ben H. Rudnick* of counsel) ; and *Stein and Shostak* (*Marjorie M. Shostak* of counsel), associate counsel; for the plaintiffs.

*John W. Douglas*, Assistant Attorney General (*Bernard J. Babb*, trial attorney), for the defendant.

WILSON, Senior Judge: The above 23 appeals for reappraisement concern certain importations, invoiced as handmade woolen rag carpets and referred to by counsel as wool rag rugs,[1] which were exported from Japan between April 27, 1950, and April 18, 1952.

The following schedule shows the invoiced and appraised values for the three separate periods of exportation here involved:

| Export period | Invoiced value | Appraised value |
| --- | --- | --- |
| April 27, 1950, to September 29, 1950 | $0.14$\frac{3}{4}$ | $0.33 |
| November 16, 1950, to January 6, 1951 | $0.14$\frac{3}{4}$ | $0.35 |
| May 6, 1951, to April 18, 1952 | $0.24$\frac{3}{8}$ | $0.395 |

All prices are per square foot, net packed.

---

[1] To avoid repetitious use of the words "wool rag carpets" or "wool rag rugs," this opinion will merely use the word "rugs." In each instance, the use of the word "rugs" shall mean the importations at bar. The reappraisement appeals are numbered consecutively from 247684–A to 247706–A, inclusive.

In some appeals, the importer deducted and added certain inland charges under duress, or added certain processing charges to make entered values. Neither of these procedures is contested, and will, therefore, be disregarded herein. In reappraisement number 247696–A, an item of woolen hooked rugs was entered at $0.39 per square foot and appraised at $0.45 per square foot. The importer makes no claim as to this item, and the appraised value, presumptively correct, must be affirmed.

Appraisement of all items in issue was made on the basis of export value, as defined in section 402(d) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, T.D. 49646.

The importers claim that there is no foreign value, export value, or United States value for the merchandise at bar. Cost of production, as defined in section 402(f) of said amended act, is claimed to be the proper basis for appraisement, and it is contended that the invoiced prices represent the correct cost of production values.

Counsel stipulated that there was no statutory foreign value for such or similar merchandise, which stipulation is binding upon the court. *Salomon & Co.* v. *United States*, 7 Ct. Cust. Appls. 5, T.D. 36255; *American Bead Co.* v. *United States*, 7 Ct. Cust. Appls. 161, T.D. 36465. But plaintiffs have the burden to establish that there is no export value or United States value applicable, and must also establish their alleged cost of production. *United States* v. *T. D. Downing Co. (George H. Sweetnam, Inc.)*, 20 CCPA 251, T.D. 46057; *United States* v. *Gane and Ingram, Inc.*, 24 CCPA 1, T.D. 48264; *Brooks Paper Company* v. *United States*, 40 CCPA 38, C.A.D. 495; *Kobe Import Co.* v. *United States*, 42 CCPA 194, C.A.D. 593; *Frank P. Dow Co., Inc.* v. *United States*, 32 Cust Ct. 547, 550, Reap. Dec. 8276; *Joseph G. Maddox, as Trustee, etc.* v. *United States*, 35 Cust. Ct. 412, 416, Reap. Dec. 8484; *Hoenig Plywood Corp. and Williams, Clarke Co.* v. *United States*, 41 Cust. Ct. 607, 609, A.R.D. 91.

Plaintiffs' only evidence consists of the oral testimony of David Flitterman and an affidavit by Harry Flitterman, exhibit 1, to which 11 subexhibits are attached.

David Flitterman testified, in substance, that during the period from 1950 to 1952 he served as president and as vice president of plaintiffs, which were two different companies. General Wool Co., Inc., of El Monte, Calif., was in the business of purchasing wool waste rag material[2] in the United States for export to Japan and import-

---

[2] To avoid repetitious use of the words "wool waste rag material," this opinion will merely use the word "rags." In each such instance, the use of the word "rags" shall mean the wool waste rag material procured in the United States and shipped to Japan for processing there into the imported rugs which are here involved.

ing the wool rag rugs made therefrom, while the business of United Importing Co. was similar, not exporting rags frequently, but importing merchandise manufactured from rags regularly. His duties with these companies were to purchase wool rag materials in the United States, and to select, pack, and ship them to Japan. He also supervised the importation of rugs made therefrom. Mr. Flitterman further testified that he had been engaged in the wool rag or wool waste business all his life up to, but not after, 1952. The witness also stated that he purchased in the United States used clothing called mixed wool bodies, basically coats, pants, and other wool items of clothing of all colors, including dark colors, that were no longer used in that form. He said he was familiar with the disposition of the imported rugs from Japan which had been processed there from the rags he had purchased in the United States and shipped to Japan. In handling this merchandise his duties included supervision of sales and distribution, as well as direct dealing in the finished imported rugs. The rugs were distributed on a very selective basis to dealers in the United States. It was necessary to choose dealers who could handle sales promotion of the item and who understood the decor of this particular type of manufacture. The witness stated that he gave extra emphasis to the rugs so as to introduce them to the American public. The rugs were not freely offered for sale at wholesale to anyone who wanted to purchase them, according to Mr. Flitterman. He further stated that the rugs consisted of strips of rags interwoven with strips of string and bound on each end; that they were just plain rag rugs and merchandising was very important. He believed that the selected purchasers were restricted as to the price at which they could resell.

The affidavit of Harry Flitterman, plaintiffs' exhibit 1, consists of 10 pages of single-spaced typing, together with 11 subexhibits, attached thereto, marked therein as plaintiffs' exhibits 1 through 11. To avoid confusion, these 11 exhibits will be referred to herein as subexhibits 1, 2, 3, etc. Reference will be made to those portions of the affidavit and of the subexhibits as deemed necessary. The affiant Harry Flitterman will be referred to hereinafter without using his first name.

Mr. Flitterman alleges that he has been in the wool business since 1943 in association with his father in Wales, and in said business in the United States since 1948. At the time of execution of the affidavit at Los Angeles, Calif., on January 27, 1964, he was still buying wool rag materials in the United States. He testified he was familiar with the cost of rags from 1948 to 1964. The witness said he designed wool rugs to be made from the rags purchased. By reason of his activities in the field since 1948, he showed great familiarity with the charac-

ter of wool rag material available in the United States and the cost thereof.

Mr. Flitterman in his affidavit sets forth his experience in the rag and wool business in the United States and Japan over a long period of years in great detail. He alleges that certain contracts were entered into between American and Japanese companies relating to the procurement of rags in the United States, their shipment to Japan for processing, and the exportation of the rugs made from the rag material from Japan to the United States. Evidently some of the original contracting parties were unable to meet their obligations under the agreements and from time to time new contracts were made with the approval of the Supreme Commander for the Allied Powers in Japan (SCAP) and the Japanese Ministry of International Trade and Industry (MITI). The essence of these contracts and their performance was that rag materials were to be purchased in the United States and shipped to Japan for processing into rugs, which products were to be exported to the United States for sale. According to Mr. Flitterman's affidavit, it was agreed between the contracting parties with the approval of SCAP and MITI that $16\frac{1}{4}$ cents per pound represented the value of the rags received in Japan and that the value of the rugs manufactured from said rags was fixed at $14\frac{3}{4}$ cents per square foot. It was asserted by Mr. Flitterman that these values were actually used in pricing the rags shipped to Japan and the rugs returned to the United States.

It appears that, during his activities in inspecting the rugs processed in Japan and his supervision of the processing operations, in some cases the affiant had occasion to study the market for the purpose of ascertaining whether any similar merchandise was manufactured in Japan for home consumption or for export to the United States. As a result of his investigations, Mr. Flitterman said that he found "no wool rag rugs anything like the product made during 1950" from the United States rags. He alleges that General Wool Co., Inc., one of the plaintiffs herein, originated the production of wool rag rugs of the type here involved and which were shipped or exported from Japan during the years 1950, 1951, and 1952.

The affiant further alleges, based upon his personal knowledge of the operations of the manufacturing firms in Japan, and upon his experience as an officer of International Products, Inc., that none of the rugs made from the rags sent into Japan from the United States was freely offered for sale for home consumption in Japan nor freely offered for exportation to the United States. He stated that "no other rugs like or similar to the wool rugs processed" from the American rags hereinbefore referred to "were being made in Japan for export to the United States until, at the earliest, the late Fall months of 1952."

The affiant claims that he was fully familiar with the sales programs and the policies of the firms involved in the transactions relating to the rags and rugs hereinbefore mentioned and concerning the sale in the United States of the rugs involved. He asserted that the imported rugs were sold to selected customers who did not offer them freely for sale in wholesale quantities to all purchasers in the United States but followed the practice of selling in wholesale quantities only through certain selected distributors. The rugs were never freely offered generally to the public in wholesale quantities in the United States.

In the Flitterman affidavit the affiant stated that he was advised that the cost of production was the proper basis for valuation of the imported rugs. He thereupon obtained certain cost of production figures for the years 1951 and 1952 from the books and records of the manufacturing concerns. Attached to the affidavit, exhibit 1, is a subexhibit 10 signed "General Wool Co., Inc., M. P. Steijger, General Manager." This same name appears on some of the consular invoices and other entry papers.

In support of the contention that cost of production is the proper basis for appraisal of the imported rugs, Mr. Flitterman, the affiant, makes certain general statements as to what was paid the processing companies for the manufacture of the rugs and alleges that certain subexhibits attached to exhibit 1 are copies made from "copies in my own records, in the records of my attorneys, or in the records of the importers, and that all of the facts stated hereinabove are true and correct to the best of my belief and recollection."

The defendant contends that the allegation by the affiant Flitterman that the instant merchandise was not freely offered for sale to all purchasers, but sold only to plaintiffs and a few other "selected" purchasers are statements of ultimate fact and are entitled to be given little or no evidentiary value and are not sufficient to overcome the presumption of correctness attaching to the appraisement on the basis of export value, citing *United States* v. *Baar & Beards, Inc.*, 46 CCPA 92, C.A.D. 705; *Brooks Paper Co.* v. *United States*, 40 CCPA 38, C.A.D. 495; and *Kobe Import Co.* v. *United States*, 42 CCPA 194, C.A.D. 593.

In the *Baar & Beards* case, *supra*, the court held that a showing of the actual purchase price in a single sale is not substantial evidence of the price at which such merchandise was freely offered for sale to all purchasers, citing *Sears, Roebuck & Co.* v. *United States*, 31 CCPA 36, C.A.D. 246, and *Kobe, supra*.

In *Sears, supra*, there was nothing in the evidence to indicate that the merchandise in question was freely offered for sale to *all* purchasers for export at invoice prices. In *Brooks, supra*, the decision

rested upon an unsupported statement that a certain quantity was the usual wholesale quantity. In *Kobe, supra*, the court held that an invoice could not of itself establish the statutory elements necessary to constitute export value of certain merchandise purchased in job lots. The above situations are not here involved. Here, competent, well-qualified and experienced witnesses in the wool rag and wool rag rug business, both in the United States and in Japan, testified in corroboration of each other, at least in part, from personal knowledge and experience, that sales were made only to selected dealers for export to the United States and that in the United States price restrictions existed. This testimony was uncontradicted. The Flitterman statements are not mere *conclusions* of the witnesses, but are evidentiary facts based upon personal knowledge and experience. Such evidence is sufficient to make out a *prima facie* case that neither a statutory export value nor a statutory United States value existed for the imported rugs at the time of the exportation thereof. *Minkap of California, Inc., by Frank P. Dow Co., Inc., of L. A.* v. *United States*, 46 Cust. Ct. 723, Reap. Dec. 10033, affirmed in *United States* v. *Minkap of California, Inc., by Frank P. Dow Co., Inc., of L. A.*, 48 Cust. Ct. 708, A.R.D. 144. Note also *Luria Steel & Trading Corp. et al.* v. *United States*, 42 Cust. Ct. 480, Reap. Dec. 9311, modified, 42 Cust. Ct. 558, Reap. Dec. 9345; *United States* v. *National Carloading Corp.*, 46 Cust. Ct. 745, A.R.D. 125, affirming *National Carloading Corp.* v. *United States*, 43 Cust. Ct. 531, Reap. Dec. 9535.

Sales to selected customers or to a limited number do not create a statutory value. In *United States* v. *Wheeler, Elder & Elder et al.*, 17 CCPA 279, 282, T.D. 43691, the court stated that the general rule is that the price at which merchandise is sold to a limited number of favored purchasers, in quantities greater or less than wholesale quantities, is not proper evidence of the market value of such merchandise, citing *United States* v. *International Forwarding Co.*, 13 Ct. Cust. Appls. 579, T.D. 41436. In the case at bar, the rugs were especially made in Japan from rags shipped from the United States for processing. The imported merchandise was sold only to selected dealers in the United States. Hence, there was no export value. The United States importers also selected their dealers and did not freely offer to sell to *all* purchasers in the United States without price restrictions. There was, therefore, no United States value.

The expression "all purchasers" does not mean members of an association, or 99 per centum of the purchasers of such goods, but all those who cared to purchase. *United States* v. *American Glanzstoff Corp.*, 24 CCPA 35, T.D. 48308.

In *Adolph Goldmark & Sons Corp.* v. *United States*, 22 CCPA 358, T.D. 47378, *all* purchasers could not receive a 7½ per centum discount.

This was held to be a "restriction upon the sales so as not to bring the sales price within the language of" section 402(c) of the Tariff Act of 1930. See also *United States* v. *Richard & Co.*, 15 Ct. Cust. Appls. 143, T.D. 42216, and *United States* v. *A. S. Neuberger and American Glanzstoff Corp.*, 19 CCPA 96, T.D. 45241.

In *United States* v. *Mexican Products Co.*, 28 CCPA 80, C.A.D. 129, the court *emphasized* that in determining foreign and export values (and this court believes it also applies to United States value), "it is proper to consider only the market values or prices at which merchandise like or similar to that imported is freely offered for sale *to all purchasers* (not to the greater number, or to those of a particular class) in the principal markets of the country from which exported in the usual wholesale quantities and in the ordinary course of trade." [Emphasis quoted.] In the case at bar, on the record, *all* purchasers, whether purchasing for export to the United States or in the United States, could *not* purchase such or similar imported rugs. Note also *American Shipping Co. (General Electric X-Ray Corp.)* v. *United States*, 29 CCPA 250, C.A.D. 198.

In *United States* v. *H. W. Robinson & Co. et al.*, 19 CCPA 274, T.D. 45436, it was held that the restriction by a manufacturer of his sales to certain purchasers only, i.e., wholesalers, established that they were not in the ordinary course of trade, as required by the statute, and could not form the basis for determining foreign value. This reasoning applies equally in respect to finding a statutory export value or United States value in the case at bar.

Counsel stipulated that no foreign value exists for such or similar imported rugs, and as held, *supra*, the record discloses a lack of proof as to export value and United States value. It becomes necessary now to ascertain whether or not the evidence establishes a value based on statutory cost of production.

Mr. Flitterman alleges in his affidavit, exhibit 1, that cost of production figures for the years 1951 and 1952 were assembled from "our books and records"; that subexhibit 10 "is a cost accounting consisting of three pages, entitled 'Cost Accounting for Processing Early American Carpet,' prepared in 1951, indicating that during 1951, the total cost of production, including the processing charges as well as the cost of the rags woven into the rugs, was U.S. $0.24375 per square foot, f.o.b. Kobe." Subexhibit 11 is stated to be a "Summary of Cost Sheet for 1952, consisting of two pages, showing that the cost of production during 1952, including the processing charge as well as the cost of the rags woven into the rugs, totalled U.S. $0.24375 per square foot during 1952." He further alleges that each of the subexhibits "is a true and correct copy of the document which it purports to be, made from copies

in my own records, in the records of my attorneys, or in the records of the importers, * * *."

With reference to the cost of production aspect of this case, the statements referred to in the preceding paragraph do *not* show that affiant Flitterman or any other qualified person obtained the cost of production figures solely from the books of account of the manufacturer or that they were entirely obtained from the books *per se*. They were, as stated in the affidavit, "assembled from our books and records" or from "copies in my own records, in the records of my attorneys, or in the records of the importers." It thus appears that *if* Mr. Flitterman was competent to testify as to the contents of such books of the manufacturer, it affirmatively appears that the statements made in exhibit 1 and in subexhibits 10 and 11 were not secured solely from such books, but in part, at least, from other sources. He does *not* state who made the said "copies," or who originally made the entries in the books of the manufacturer, or who supervised the making of the entries in the books of the manufacturer, or who had personal knowledge thereof, or who compared such "copies" with the books of the manufacturer. He did not indicate that he had charge of the cost records or supervised the entries by others. Even if he did have charge of such cost records, that mere fact does not entitle his statements respecting their contents to carry weight. *United States* v. *Philipp Wirth et al.*, *Philipp Wirth et al.* v. *United States*, 24 CCPA 188, 193, T.D. 48654, citing *United States* v. *Brown & Co.*, 4 Ct. Cust. Appls. 102, T.D. 33374.

In the *Brown* case, *supra*, entries in books were offered in evidence to prove the condition of an importation on its arrival. A manager who did not make the entries in question and who had no personal knowledge of the facts, was said to be an incompetent witness to prove the entries. In the case at bar, Harry Flitterman does not allege that he made any of the entries in the books of the manufacturers or that the figures in subexhibits 10 and 11 were specifically within his personal knowledge. He does say (page 3 of exhibit 1) that because of his activities he knows "the price of wool rags [exported from the United States], and [has] been familiar with such costs from 1948 to date [January 27, 1964]." That statement does not make him competent to testify as a witness with personal knowledge as to the *costs of the wool rag rugs* produced from such wool rags in Japan.

In *Chaffee* v. *United States*, 85 U.S. 516, referred to in the *Brown* case, *supra*, the Supreme Court stated that the general rule which governs admissibility of entries in books made by private parties in the ordinary course of trade of their business, requires that the entries be made contemporaneously with the transactions to which they relate, and shall *be made by parties having personal knowledge of the facts*.

The evidence in the case at bar does not meet these basic requirements.

In *Gerhard & Hey Co., Inc. (Philipp Wirth)* v. *United States*, 27 Cust. Ct. 479, Reap. Dec. 8063, the trial court stated that the parties agreed that the merchandise then before the court was similar to the merchandise in the *Philipp Wirth et al.* case, *supra*, which was a so-called test case that terminated in a dismissal of the appeal for failure to prove a statutory cost of production under section 402 (e) and (f) of the Tariff Acts of 1922 and 1930, respectively. The court also stated that exhibit 3 therein was inaccurate as the affiant Weichel alleged on February 10, 1933, that he not only had personal supervision of the books of the manufacturer, but that *all of the entries in said books* were made under his instructions and he had personal knowledge of *all the entries in the books of said company*, whereas exhibit 2 therein, also an affidavit by Weichel (which was in evidence as exhibit 12 in the test case), referred to office records from 1926 through 1932, but Weichel was not in their employ prior to July 4, 1929. The court also stated that the affiant Baeder in exhibit 4 stated that he made all entries in the books of the manufacturer *together with the deceased bookkeeper director*, and figured all costs records, and made all respective entries in said books according to instructions and supervision of Weichel. The court concluded that the additional evidence did not overcome the deficiencies in the test case where it was found that there were no books of account or other records of the manufacturer separately showing its general expenses and profit, and that Weichel did not obtain his information solely from the regular books of account, but from other sources as well. The appeals for reappraisement were dismissed for failure to supply sufficient evidence upon which to find values based upon cost of production, the merchandise there involved having been exported prior to the effective date of the Customs Administrative Act of 1938. The decision and judgment of the trial court in Reap. Dec. 8063 were affirmed in *Gerhard & Hey Co., Inc. (Philipp Wirth)* v. *United States*, 30 Cust. Ct. 580, A.R.D. 13.

The record in the case at bar fails to disclose who made the book entries contemporaneously with the transactions to which they allegedly relate. The affiant Flitterman does not allege that he made or even supervised the making of cost of production records. At best, the figures in subexhibits 10 and 11 are *copies* from either his records, the records of his attorney, or the records of the importer, or perhaps a combination of two or three of said records. This is not substantial or sufficient evidence upon which to base a finding of cost of production under the statute and the cases cited herein. There is nothing in subexhibit 10 to show the year to which it may refer, nor are Steijger's duties shown. It does not appear that he was knowledge-

able as to the figures stated in said subexhibit or that they were made from entries in the books of the manufacturer by him or under his supervision and direction.

Assuming, without holding, that the tabulations in subexhibits 10 and 11 should be given full credit, they are not sufficient to establish cost of production, as defined in section 402(f) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, which reads as follows:

Sec. 402. Value.

        \*        \*        \*        \*        \*        \*        \*

(f) Cost of Production.—For the purpose of this title the cost of production of imported merchandise shall be the sum of—

(1) The cost of materials of, and of fabrication, manipulation, or other process employed in manufacturing or producing such or similar merchandise, at a time preceding the date of exportation of the particular merchandise under consideration which would ordinarily permit the manufacture or production of the particular merchandise under consideration in the usual course of business;

(2) The usual general expenses (not less than 10 per centum of such cost) in the case of such or similar merchandise;

(3) The cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the particular merchandise under consideration in condition, packed ready for shipment to the United States; and

(4) An addition for profit (not less than 8 per centum of the sum of the amounts found under paragraphs (1) and (2) of this subdivision) equal to the profit which ordinarily is added, in the case of merchandise of the same general character as the particular merchandise under consideration, by manufacturers or producers in the country of manufacture or production who are engaged in the production or manufacture of merchandise of the same class or kind.

There are numerous deficiencies in subexhibits 10 and 11 which warrant excluding them or either of them as effectively establishing a statutory cost of production of any of the imported rugs.

This court may not properly substitute the statements in the various agreements as approved by SCAP and MITI as evidence of "the statutory cost of production of the rugs exported," as suggested by plaintiffs. *United States* v. *Malhame & Co.*, 19 CCPA 164, T.D. 45276.

Plaintiffs contend that the profit to be added in determining cost of production is the profit which is "*ordinarily added in fixing the price for merchandise*, and not the net profits *realized* in the year of sale." [Emphasis quoted.]

In *United States* v. *Jovita Perez*, 36 CCPA 114, C.A.D. 407, the court held:

\* \* \* that the allowance to be made for profit in determining cost of production herein is the amount ordinarily added by the manufacturer of the instant merchandise, because it is the only Mexican manufacturer that kept records from which the amount of the costs of production and the amount of the profit usually added can be ascertained. For the purpose of this case, the Mexican-American Flavors Co., S.A., is the sole manufacturer of merchandise of the same class or kind as the particular merchandise under consideration. It naturally follows that the profit usually added is the profit actually added.

The court also stated:

The item of profit cannot be based upon the "estimated profit" but must be based on the profit usually added.

There is no indication in the record of other manufacturers in Japan of merchandise of the "same class or kind as the particular merchandise under consideration." The profit herein is stated to be estimated for the year 1952. Plaintiffs do not allege specifically what they claim represents the profit ordinarily, usually, or actually added for shipments in 1950, 1951, or 1952.

The infirmities in exhibit 1 and subexhibits 10 and 11 with respect to cost of production are evident. Those exhibits are not proof of a statutory cost of production.

Giving full force and weight to the uncontradicted evidence relating to export value, I conclude that it is sufficient *prima facie* to overcome the presumption of correctness attached to the appraiser's appraisement herein on the basis of export value. Likewise, on the record, I conclude that the proof establishes a *prima facie* case to the effect that no United States value existed for the imported rugs during the involved period. I also conclude, based upon the stipulation of counsel which is supported by the record, that no foreign value existed for such or similar imported rugs during the involved period. I further conclude, on the record, that the importer has failed to establish a statutory cost of production. On the record, therefore, though the basis of appraisement and the appraised values are erroneous, they must, nevertheless, remain in full force and effect. *Kobe Import Co.* v. *United States*, 42 CCPA 194, 198, C.A.D. 593.

Accordingly, on the record made herein, the court finds as facts:

1. The imported merchandise consists of wool rag carpets, also referred to as wool rag rugs, produced in and exported from Japan during the period between April 27, 1950, and April 18, 1952.

2. Such imported merchandise was manufactured in Japan under contracts with certain firms which had shipped to said manufacturers

wool rags procured in the United States, which said rags were sent to Japan for processing into the imported rugs.

3. The contracts and extensions thereof here involved were approved by the Supreme Commander for the Allied Powers (SCAP) and by the Japanese Ministry of International Trade and Industry (MITI).

4. The imported rugs were appraised on the basis of export value, as defined in section 402(d) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938.

5. Rugs such as or similar to those imported were not freely offered for sale for home consumption in Japan, or for export to the United States, or freely offered for sale in the United States during the export period here involved.

6. The importer has not offered sufficient, satisfactory evidence to warrant a finding of fact establishing cost of production as the correct basis for appraisement.

I conclude as matters of law:

1. On the record, there is no adequate proof of statutory value on the basis of foreign value, export value, United States value, or cost of production, as defined, respectively, in section 402 (c), (d), (e), and (f) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, T.D. 49646.

2. As plaintiffs have failed to establish a dutiable value other than the appraised value, the appraised value must be affirmed as to all items imported in all reappraisement appeals in issue. *Kobe Import Co.* v. *United States*, 42 CCPA 194, 198, C.A.D. 593.

Judgment will issue accordingly.