(R.D. 11225)

ARTHUR J. HUMPHREYS *v*. UNITED STATES

Entry No. 21–2642, etc.

(Decided October 10, 1966)

*Glad & Tuttle* (*George R. Tuttle* of counsel) for the plaintiff.

*J. William Doolittle*, Acting Assistant Attorney General (*Glenn E. Harris*, trial attorney), for the defendant.

WILSON, Judge: Eight appeals for reappraisement were consolidated for purposes of trial. The involved merchandise is invoiced either as "Harveycast Durocrete Castable" or "Harveycast Castable" or "Harveycast Castable Refractory," which is a refractory concrete. The involved product is not enumerated on the final list, T.D. 54521.

The manufacturer who is also the seller, Clayburn-Harbison, Ltd.,[1] Vancouver, B.C., Canada, exported the material in question between April 28, 1960, and November 26, 1960. The plaintiff is a customhouse broker who made entry for the account of Harvey Aluminum (Inc.),[2] Torrance, Calif., which was the actual purchaser and was a company unrelated to the seller. At the time of exportation, Harvey was the exclusive purchaser of "Harveycast" merchandise.

Appraisement was made in United States dollars at $90 per ton of 2,000 pounds, less 10 percent discount, packed, ready for shipment. The appraisal was made on the basis of *similar* merchandise at its export value, as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, T.D. 54165.

The plaintiff contends that the merchandise should be valued at $55 per ton, net packed, on the basis of *such* merchandise. This is claimed to be the true export value, as defined, *supra*. That price is alleged to represent the selling price to Harvey, the instant purchaser. The invoices in some instances show invoiced prices at $73.50 per ton and in the remainder of the entries at $57.50 per ton.

The defendant, in its brief, contends "that export value was nonexistent at the time of exportation for 'such' merchandise, i.e. for the identical merchandise produced by the same manufacturer (see Section 402(f)(4)(A) * * *)." It also contends that appraisement must, therefore, "rest upon sales or offers to sell 'similar' merchandise (see Section 402(f)(4) (B), (C), (D) * * *)."

The following statutes are considered herein:

Section 402(b), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, T.D. 54165:

> EXPORT VALUE.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the

---

[1] Hereinafter referred to as Clayburn.

[2] Hereinafter referred to as Harvey.

absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

Section 402(f), Tariff Act of 1930, as amended, *supra:*

DEFINITIONS.—For the purposes of this section—
(1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—
    (A) to all purchasers at wholesale, or
    (B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,
without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.

\*     \*     \*     \*     \*     \*     \*

(4) The term "such or similar merchandise" means merchandise in the first of the following categories in respect of which export value, United States value, or constructed value, as the case may be, can be satisfactorily determined:
    (A) The merchandise undergoing appraisement and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, the merchandise undergoing appraisement.
    (B) Merchandise which is identical in physical characteristics with, and was produced by another person in the same country as, the merchandise undergoing appraisement.
    (C) Merchandise (i) produced in the same country and by the same person as the merchandise undergoing appraisement, (ii) like the merchandise undergoing appraisement in component material or materials and in the purposes for which used, and (iii) approximately equal in commercial value to the merchandise undergoing appraisement.

Everett M. Monroe, deputy appraiser at Blaine, Wash., called by plaintiff, was the only person to testify. The plaintiff also introduced in evidence exhibits 1 to 3. The official files in these appeals were received in evidence without being marked. The defendant presented no evidence.

Mr. Monroe testified that his jurisdiction extends to all Canadian border ports throughout the State of Washington from Midland Falls, east; that as control appraiser he advises the Government officials at the northern border ports of the value of imported merchandise; that, in this case, he considered Clayburn's price list, which is plain-

tiff's exhibit 1, as well as information from plaintiff, the customhouse broker, as the basis for advice to the examiner at Sumas, Wash., concerning the value for appraisement purposes of the merchandise here under consideration. In so doing, he adopted the price of $90 per ton, less 10 percent discount, which exhibit 1 indicates to be the price for "Durocrete Castable." He also considered a "note" from the broker addressed to Mr. Moe, deputy collector, which is attached to the "Special Customs Invoice" in entry 21–979 (R61/20962) and reads as follows:

Mr. Moe,
Re the Harvey Cast Castable—we phoned the shipper and they inform us that this commodity is the same as Durocrete Castable except for one component of manufacture which does not affect the cost of the product materially. [this portion is typed]

ARTHUR J. HUMPHREYS
Customhouse Broker
SUMAS, WASHINGTON [this portion is by rubber stamp]

Mr. Monroe stated that a supplementary letter dated October 3, 1960, from the broker to Mr. Moe, found in the same file, was not taken into account. That letter states that the merchandise in entry 21–979 was "erroneously entered * * * at a net value of $81 per ton" and should have been entered at $55 per ton, net. The broker attached a "corrected Special Customs Invoice" which merely has the effect of transferring the item of $55 in column 6 of the original invoice to column 7 in the corrected invoice. These columns read, respectively, "(6) Current Unit Price for Home Consumption in Home Currency $55.00" and "(7) Current Unit Price for Export to the United States $55.00" both in United States funds. Both invoices show in column 4 that the "Invoice Unit Price or Value" in United States money is $73.50.

At a subsequent hearing at San Francisco on February 26, 1965, plaintiff offered a letter dated May 26, 1964, addressed to plaintiff's attorneys by Clayburn, which was received as plaintiff's exhibit 2. Defendant's counsel waived his "right for proper certification," and stated "No objection as to form but we reserve our usual objections to the weight." That letter is in reply to a letter from plaintiff's counsel dated May 11, 1964 (not in evidence), and states in part:

In answer to your various questions:

1) Harveycast is not sold to any other purchaser in the U.S.A., other than Harvey Aluminum Company.

2) Harveycast is not sold on the Canadian market or for exportation to any third country, in other words it is made solely for Harvey Aluminum Company.

3)  It is not applicable as explained in 2) above.

4)  Harveycast is a much lower grade product than Durocrete.

5)  The similarity between Harveycast and Durocrete is that both are a refractory concrete.

6)  We are enumerating hereunder the sales of Durocrete made during the period April through November, 1960, for export to the U.S.A.:

| April | 1 sale |
| October | 1 sale |
| November | 2 sales |
| August | 1 sale |

Plaintiff also offered a letter dated January 18, 1965, addressed to plaintiff's attorneys by Clayburn, enclosing therewith copies of papers referred to below, received as plaintiff's collective exhibit 3. As to this exhibit, defendant's counsel stated: "No objection subject to the same reservations." The above letter is in reply to a letter from plaintiff's attorneys dated January 11, 1965 (not in evidence). It states that the appeals are set for hearing on February 9, 1965, and further states:

In regard to other information requested in your letter:

1)  There is no relationship between Harvey Aluminum Company and Clayburn-Harbison Ltd. In other words Harvey Aluminum Company was an independent buyer and our company was an independent seller.

2)  No other sales of Harveycast were made to any company other than Harvey Aluminum, as this material was developed especially for their use and sold to no one else, hence the name Harveycast.

3)  We understand that this material is used for sealing off buzz bars in the production cell pots. The buzz bars are steel bars that connect with carbon blocks which run horizontal in the bottom of the pots. This material is used to seal off the openings where the buzz bars go through the sides of the pots.

4)  Price agreement was reached with Harvey Aluminum Company by our quotation of March 18th, 1960 at $75.95/Ton f.o.b. The Dalles, Oregon, which was later *negotiated* by telephone and confirmed in our letter of March 21st, 1960 at $73.50/Ton f.o.b. The Dalles. [Emphasis supplied.]

Attached as part of collective exhibit 3 are photocopies of (a) "Quotation Inquiry" from Harvey dated March 15, 1960, asking Clayburn for prices, terms and delivery of certain firebricks and pallets (not here involved) and of 200,000 pounds of "Castable Refractory, Laclede Christy Economix or approved equal"; (b) reply by Clayburn dated March 18, 1960, stating "the castable would be Clayburn castable equivalent to the Laclede Christy Economix," the price being

shown on the "Quotation Inquiry" at list price of $75.95, f.o.b. The Dalles, Oregon; (c) letter from Clayburn to Harvey, dated March 21, 1960, confirming telephone conversation on said date and stating that the price would be "$73.50 per ton F.O.B. cars the Dalles including all freight and duty," and that they are looking forward to receiving confirmation order; (d) purchase order from Harvey to Clayburn, dated March 22, 1960, No. HDR 4533, showing price at $73.50 per ton, net 30 (days) duty paid for "200,000 LBS. CASTABLE REFRACTORY, LACLEDE CHRISTY ECONOMIX OR APPROVED EQUAL," f.o.b. The Dalles, Oregon, and (e) Clayburn order No. 934, Harvey order No. HDR 4533, dated March 28, 1960, confirming the said Harvey order, showing price of $73.50 per ton, net, f.o.b. The Dalles, Oregon, including duty, brokerage and freight. It also shows "Col. 11–55.00/T."

On plaintiff's motion, to which defendant objects, the official papers in these eight reappraisement appeals were received in evidence without being marked.

It is contended in plaintiff's brief that the evidence in exhibits 2 and 3 establishes a *prima facie* case that export value of such merchandise under section 402(b) is $73.50 per ton, f.o.b. The Dalles, Oregon, and that that is the correct value for the merchandise involved herein. The plaintiff further argues that the sales to Harvey Aluminum Co. fall within the definition set forth in section 402(f) to establish export value for such merchandise.

It is contended in defendant's brief that plaintiff failed to prove by competent evidence that there is an export value for *such* merchandise. The defendant further argues that the plaintiff also failed to prove by competent evidence that "Durocrete Castable" is *not similar* for appraisement purposes to the imported "Harveycast Castable," and that the appraised export value of *similar* merchandise is erroneous.

The statutory presumption is that the finding of value by the appraiser is correct. The burden of proof in reappraisement cases is upon the party challenging the appraiser's finding of value. Such party must show by competent evidence that the appraised value is erroneous and must go further and establish some other dutiable value to be correct. 28 U.S.C., section 2633, and the following cases: *I. Arditi* v. *United States*, 50 CCPA 49, C.A.D. 818, citing *Brooks Paper Company* v. *United States*, 40 CCPA 38, C.A.D. 495; *Kenneth Kittleson* v. *United States*, 40 CCPA 85, C.A.D. 502; *H. S. Dorf & Co., Inc., etc.* v. *United States*, 41 CCPA 183, C.A.D. 548. See also *Luckytex, Ltd.* v. *United States*, 56 Cust. Ct. 575, Reap. Dec. 11119 (December 29, 1965) (not appealed).

In *Kobe Import Co.* v. *United States*, 42 CCPA 194, C.A.D. 593, the court indicated that it is not "incumbent upon the Government to

prove that the appraised value is proper, until and unless the importer shows such appraisement to be erroneous and establishes a different value in place thereof."

In this case, the presumption is that the appraiser ascertained that an export value for *such* merchandise did not exist as required by sections 402(b) and 402(f) (1) (A) and (4) (A) and (B) and, therefore, he adopted the export value of *similar* merchandise as required by sections 402(b) and 402(f) (1) (B) and (4) (C).

The evidence herein shows that Harvey inquired of Clayburn as to prices and terms for 200,000 pounds of "Castable Refractory, Laclede Christy Economix or approved equal." The reply was $75.95 per ton. Thereafter, a telephone call between the parties "negotiated" the price to $73.50 per ton, net, including duty, brokerage and freight. (See Clayburn letter of January 18, 1965, part of collective exhibit 3.)

The special customs invoices, except in R61/20964, R61/20965 and R61/20972, show an invoice price of $73.50 per ton, duty, freight, and customs brokerage fees, prepaid. In the above three excepted cases, the invoice price is $57.50 per ton, and the special customs invoices in those cases refer to Harvey's order No. HDR 21666 accepted November 14, 1960, and not to order No. HDR 4533 as stated in collective exhibit 3 accepted March 28, 1960. In R61/20962, the order number is HDR 21066, the date of shipment is September 21, 1960, and no date of acceptance of the order is shown. The price is $73.50. In R61/20963, the order number is 04777 accepted October 12, 1960, and the price is $73.50. There is no explanation for changes in prices or for the several order numbers.

The differing prices, or a final price, brought about by "negotiation" indicates a final price brought about by "bargaining." That is evidently what Harvey and Clayburn did in finally arriving at a price of $73.50, after a telephone call, which price, however, was again lowered by other subsequent orders as shown, *supra.*

In *Harry Garbey* v. *United States*, 24 CCPA 48, 52, T.D. 48332, the appellant contended that there was no definite offering for unique diamonds which could be taken as the freely offered price to all purchasers because such "transactions in such merchandise are the result of bargaining, the seller frequently asking more than he is willing to take and more than he expects to obtain." The court then stated:

This may be true, but we cannot agree that it follows, as a matter of law, that the price actually obtained must be taken as the dutiable value in all instances. That assuredly cannot be held to meet the statutory requirements.

That is apropos here on the record which shows that "such" merchandise was not freely sold or offered for sale *to all purchasers* at wholesale for export to the United States as provided for in section

402(f)(1)(A), *supra*, but on the contrary, was only sold or offered to one particular selected purchaser. See section 402(f)(1)(B), *supra*. However, the latter section requires that the price to the selected purchaser shall represent "a price which fairly reflects the market value of the merchandise." There is no evidence to that effect of record herein. Because the price was "negotiated," it cannot be accurately stated that the price finally arrived at, or any of the invoiced prices, "fairly reflects the market value of the merchandise" under the terms laid down by the above statute.

Exhibit 2, quoted in part, *supra*, shows exclusive manufacture for and sale to Harvey and that Harveycast is a much lower grade product than Durocrete, both being castables and refractory concrete and thus similar. Five sales of Durocrete were made to the United States between April and November 1960. Prior to appraising the importations, consideration was given to the "note" attached to the papers in R61/20962, entry 21–979, which states that Clayburn informed the plaintiff that Harveycast castable "is the same as Durocrete Castable except for one component of manufacture which does not affect the cost of the product materially." Clayburn's statement in exhibit 2 which is dated May 26, 1964, conflicts with the "note." Exhibit 2 is *after* the date of appraisement in *all* cases, to wit, March 16, 1961, and *after* the appeals for reappraisement were filed in April 1961 and May 1961, as noted in the official papers on file. The court is inclined to give greater weight to statements made *prior* to appraisement than to statements made three years after litigation was commenced and was still pending.

In *United States* v. *The Heyman Co., Inc.*, 48 CCPA 13, C.A.D. 755, the court held that a price differential between henequen and istle pads was not sufficient to justify the conclusion that they were not similar. The court stated that the pads were used for the same purpose, though the materials were different, and that there is "a sufficient resemblance to support the holding of the Customs Court that they are similar." This logic should follow on the facts in this case. See also *H. J. Heinz Company* v. *United States*, 43 CCPA 128, C.A.D. 619, and cases cited therein on question of similarity.

There is no competent evidence of record to establish (1) a statutory export value for "such" merchandise; (2) that "Durocrete Castable" is *not* similar for appraisement purposes to the imported "Harveycast Durocrete Castable" or the "Harveycast Castable" or the "Harveycast Castable Refractory"; (3) that the appraised value of similar merchandise is erroneous. The appraised value is supported by Clayburn's price list, received in evidence as plaintiff's exhibit 1.

The importer has clearly failed to make out a *prima facie* case in support of its claimed export value.

On the record herein I find the following facts:

1. That the imported merchandise consists of refractory concrete invoiced as either "Harveycast Durocrete Castable" or "Harveycast Castable" or "Harveycast Castable Refractory" exported from Canada between April 18, 1960, and November 26, 1960.

2. The said merchandise is not enumerated on the final list published in T.D. 54521.

3. The imported merchandise was appraised on the basis of export value, as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, T.D. 54165. The appraised value is in United States dollars at $90 per ton of 2,000 pounds, less 10 percent discount, packed, which is the listed price of merchandise identified on the exporter's price list, plaintiff's exhibit 1, as "Durocrete Castable."

4. Plaintiff offered no competent evidence to show that the merchandise claimed to be similar to the imported products was not in fact similar or that the appraised value therefor was erroneous.

On the record herein, I find as conclusions of law:

1. That the plaintiff has failed to make out a *prima facie* case on the basis of its claimed export value.

2. That the presumptively correct appraised value on the basis of export value of similar merchandise has not been overcome.

3. That export value, as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, T.D. 54165, is the proper basis for determination of the value of the merchandise involved herein.

4. That such export value is represented by the appraised value of all of the involved merchandise in each of the eight appeals for reappraisement herein under consideration.

Judgment will be entered accordingly.