(R.D. 11304)

MILLMASTER INTERNATIONAL, INC., ET AL. *v.* UNITED STATES

Entry No. 69963, etc.

(Decided May 15, 1967)

*Barnes, Richardson & Colburn* (*Norman C. Schwartz* of counsel) for the plaintiffs.

*Barefoot Sanders*, Assistant Attorney General (*Harold L. Grossman*, trial attorney), for the defendant.

WILSON, Judge: The imported merchandise is an industrial chemical invoiced as "THIOUREA chem. pure." In the 60 reappraisement appeals herein consolidated for purposes of trial, the material was exported from West Germany from time to time during 1961 and 1962.

The manufacturer-exporter will be referred to hereinafter by the abbreviated name of "Degussa." The plaintiffs will be referred to as Millmaster. The only other producer of thiourea in West Germany, mentioned in plaintiffs' exhibits 2 and 7, will be designated herein as "Trostberg."

Thiourea is specified on the final list published by the Secretary of the Treasury in 93 Treas. Dec. 14, T.D. 54521, as required by the Customs Simplification Act of 1956, 91 Treas. Dec. 295, T.D. 54165. The value of the imported merchandise must, therefore, be determined under section 402 of the Tariff Act of 1930, or as amended by the Customs Administrative Act of 1938, 74 Treas. Dec. 17, T.D. 49646, and redesignated as "Sec. 402a. VALUE (ALTERNATIVE)" in the above Customs Simplification Act of 1956.

Appraisement was made at deutsche marks 3.25 per kilo, net, packed, in all appeals, on the basis of foreign value as defined in section 402a(c), *infra.*

Plaintiffs contend that there was no foreign value as provided under section 402a(c) or export value under section 402a(d) of the aforesaid statutes, that United States value as provided for in section 402a(e) is the proper basis for appraisement, and that said values are set forth in United States dollars for different periods of time in plaintiffs' exhibit 3.

Defendant contends that plaintiffs have failed to produce substantial evidence showing the nonexistence of either a statutory foreign or export value for both such and similar merchandise. The defendant further argues that the amounts of general expenses and profit asserted under United States value have not been satisfactorily established under the law as set forth in *Judson Sheldon International Corporation* v. *United States*, 51 Cust. Ct. 374, Reap. Dec. 10586, affirmed 54 Cust. Ct. 733, A.R.D. 183, and not further appealed.

The following statutes must be considered:

Section 402a(c), as amended, *supra*, reads:

(c) FOREIGN VALUE.—The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale for home consumption to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

Section 402a(d), as amended, *supra*, reads:

(d) EXPORT VALUE.—The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

Section 402a(e), as amended, *supra*, reads:

(e) UNITED STATES VALUE.—The United States value of imported merchandise shall be the price at which such or similar imported merchandise is freely offered for sale for domestic consumption, packed ready for delivery, in the principal market of the United States to all purchasers, at the time of exportation of the imported merchandise, in the usual wholesale quantities and in the ordinary course of trade, with allowance made for duty, cost of transportation and insurance, and other necessary expenses from the place of shipment to the place of delivery, a commission not exceeding 6 per centum, if any has been paid or contracted to be paid on goods secured otherwise than by purchase, or profits not to exceed 8 per centum and a reasonable allowance for general expenses, not to exceed 8 per centum on purchase goods.

At the trial of this case, counsel for the respective parties entered into a long oral stipulation (R. 4–10). Such portions of this agreement as are germane will be referred to hereinafter. Supplementing the stipulation the importers called one witness and offered in evidence seven exhibits. Defendant offered no evidence.

The stipulation of counsel provides in part that an agreement, exhibit 1, existed during 1961 and 1962 between Degussa and Millmaster granting plaintiffs the exclusive right to import thiourea from

Degussa; that in said period Degussa did not offer or sell thiourea to any other United States purchaser; that the affidavit of Annemarie Killius, sworn to on August 27, 1963, be received as plaintiffs' exhibit 2 subject to the defendant's right to object in its brief to admissibility; that plaintiffs claim United States value in the amounts reflected in plaintiffs' exhibit 3 as the proper value for appraisement; that thiourea manufactured by Degussa, as appears in exhibit 3, was freely offered during 1961 and 1962 by Millmaster to all purchasers in the United States for domestic consumption without restriction of any kind, in the principal market of New York, and the usual wholesale quantity was from 1 bag (net 25 kilos) to less than 2,000 pounds (36 bags); that the price in said usual wholesale quantities is as stated in exhibit 3 in the column "U.S. SELLING PRICE" for the different periods. Millmaster's four pricelists covering the involved period were received as plaintiffs' collective exhibit 4. The prices shown therein for less than 2,000 pounds are the prices shown in exhibit 3 as the selling prices for the various periods. These selling prices are not in dispute and, therefore, need not be further considered.

The stipulation also provides that the figures under the headings "Foreign Inland Freight," "Ocean Freight," and "Marine Insurance" in exhibit 3 are the invoiced amounts paid during each indicated period. The figures for "GENERAL EXPENSES: Operating" in exhibit 3 are derived from Millmaster's operating statement reflecting its *overall* operations in the sale of thiourea and five or six other chemicals during each involved period and that such figures are derived by applying to the various United States selling prices, above referred to, a percentage equal to the ratio of "Operating expenses" to the respective "Sales" volumes stated in exhibit 5; that the figures for "Profit" in exhibit 3 are likewise derived by applying to the respective United States selling prices a percentage equal to the ratio of "Net income before taxes" to "Sales" as stated in exhibit 5; that no separate books covering thiourea operations were kept by Millmaster; that the data in exhibit 5 is a summary of the various accounts and books of record maintained by Millmaster covering its *overall* operations; that defendant disputes the said method by which plaintiffs derive their claimed statutory deductions for general expenses and profit and reserves the right to argue this point in its brief.

The stipulation further provides that the figures in exhibit 3 for "GENERAL EXPENSES: Freight out & Storage" represent actual amounts expended by plaintiffs for freight out and storage of thiourea after the merchandise had reached the principal market; that plaintiffs do not claim deductions therefor as "other necessary expenses from place of shipment to place of delivery" but claim them as deductions as

"general expenses"; that defendant does not challenge the accuracy of said amounts but disputes their inclusion in statutory general expenses; that the figures in exhibit 3 for "Duty" are based upon the estimated duty deposited upon entry at a value of deutsche marks 3.25 per kilo, converted at quarterly rates of exchange published by the Secretary of the Treasury, said value being the appraised value in each entry, and at a rate of 10½ per centum ad valorem. The defendant argues that such estimated duty in said amount was deposited in each entry of the consolidated appeals, except in R63/6040 and R63/6041 wherein estimated duty was deposited at a figure of $0.2359 per pound; that defendant disputes the said method by which plaintiffs derive their claimed duty deduction; that plaintiffs agree that the commercial invoices be received in evidence without being marked and concede that the selling price set forth therein is the price paid by plaintiffs to Degussa.

Plaintiffs introduced an affidavit of Annemarie Killius sworn to November 26, 1965, showing sales for home consumption from January 1, 1957, to June 30, 1963, with annual sales lists attached thereto. This affidavit was received in evidence as plaintiffs' exhibit 6. Plaintiffs' exhibit 7 is the affidavit of Wolfram Schulte, associated with a firm which recommenced the production of thiourea in West Germany in 1960, said firm being referred to herein as "Trostberg." These exhibits will be referred to *infra*.

Plaintiffs' only witness, Richard R. Dixon, testified that he is the chief accountant for Millmaster. He majored at Fordham University in accounting, but he is not a certified public accountant (R. 21). However, he has worked under Arthur J. Schillig, a certified public accountant (R. 22). He worked on the Millmaster books. His testimony relates to United States value which is the basis of appraisal contended for by plaintiffs.

The following principle in reappraisement cases is well understood in customs litigation. A presumption of correctness attaches to the appraised value under 28 U.S.C., section 2633. See also *United States v. Collin & Gissel (Ludwig Baer)*, 29 CCPA 96, 103, C.A.D. 176. To overcome such presumption, plaintiffs must establish that the appraisement is erroneous and *also* prove their own claimed value. Upon failure to do so, the appraised value remains in full force and effect. The Government need not prove the correctness of the appraised value unless and until the plaintiff has shown the appraisement to be erroneous. If plaintiff fails to sustain this dual burden, the appraisement, even though erroneous, remains in full force and effect. *Lilli Ann Corporation* v. *United States*, 57 Cust. Ct. 714, Reap. Dec. 11248, decided December 21, 1966, and not appealed, citing the following cases:

*Brooks Paper Company* v. *United States*, 40 CCPA 38, C.A.D. 495; *Kenneth Kittleson* v. *United States*, 40 CCPA 85, C.A.D. 502; *Kobe Import Co.* v. *United States*, 42 CCPA 194, C.A.D. 593. See also *Hoenig Plywood Corp., Williams, Clarke Co.* v. *United States*, 41 Cust. Ct. 607, A.R.D. 91.

The appraisements herein were made on the basis of foreign value, *supra*. Plaintiffs have undertaken to establish that there was no foreign or export value for the involved thiourea exported from West Germany during 1961 and 1962, and to establish that United States value, *supra*, is the proper basis for appraisement at the value set forth for said period in exhibit 3.

On the question of foreign value for thiourea during the period involved, the affidavit of Schulte, exhibit 7, discloses that "Trostberg" "has never offered or sold Thiourea [for domestic consumption in West Germany] on the basis of a circulated or published price list. We negotiate individually with each customer and attempt to obtain the highest price in each instance, regardless of quantity. Consequently, prices for Thiourea vary widely and bear no direct relationship to quantity sold." Plantiffs' exhibit 7 also stated that "Trostberg" "sells in the domestic market only to consumers, and to a selected number of wholesalers, who sell exclusively in their particular sales territories." While there is no list of sales to show variations in prices and no specific data to support what may appear to be conclusions in part, the court is cognizant, on the facts stated in exhibit 7, that Schulte is testifying from his own personal knowledge and familiarity with the production, sale and offer for sale of thiourea by "Trostberg" based upon his duties since 1960. His statements, therefore, are *not* mere conclusions and are sufficient to make out a *prima facie* case that "Trostberg" did *not* sell thiourea for home consumption pursuant to the foreign value statute. See *General Wool Co., Inc., et al.* v. *United States*, 56 Cust. Ct. 730, Reap. Dec. 11177 (application for review pending), citing *Minkap of California, Inc., by Frank P. Dow Co., Inc., of L.A.* v. *United States*, 46 Cust. Ct. 723, Reap. Dec. 10033, affirmed in *United States* v. *Minkap of California, Inc., by Frank P. Dow Co., Inc., of L.A.*, 48 Cust. Ct. 708, A.R.D. 144; *Luria Steel & Trading Corp. et al.* v. *United States*, 42 Cust. Ct. 480, Reap. Dec. 9311, modified, 42 Cust. Ct. 558, Reap. Dec. 9345; *United States* v. *National Carloading Corp.*, 46 Cust. Ct. 745, A.R.D. 125, affirming *National Carloading Corp.* v. *United States*, 43 Cust. Ct. 531, Reap. Dec. 9535.

Further on the question of a foreign value, the affidavit of Annemarie Killius, plaintiffs' exhibit 2, discloses that her duties as assistant to the sales manager of Degussa from 1957 to the date of her affidavit, August 27, 1963, included the supervision of all offers for sale

and sales of thiourea for home consumption in West Germany. She supervised and approved all offers for sale and sales. Miss Killius stated that, during said time, sales were made only to selected wholesalers, who had certain prescribed territories, and to consumers; that the prices to both classes for the same periods ranged from DM2.50, 2.70, 2.57, and 2.43 to DM3.15 per kilo "for wholesale quantities, depending upon the bargaining ability of the customer and the status of the customer as a consumer of Thiourea, the purchaser obtaining the lowest price possible regardless of quantity"; that in bargaining, an office pricelist which was not distributed or otherwise made available to purchasers was used, and Degussa tried to obtain the highest price possible; and that there is not and has not been a uniform price at which Degussa sold thiourea in wholesale quantities to consumers or wholesalers.

An annual list of home consumption sales is attached to Killius' second affidavit, plaintiffs' exhibit 6. This list was referred to, but not included, in plaintiffs' exhibit 2. That list shows a variation of prices for different quantities in the same period. Exhibit 2 is alleged to contain representative sales aggregating 10 percent of all sales for home consumption, the affiant stating that the sales were "so numerous that it was impractical to append * * * all of the sales covering such sales." The copies of sales that are attached to exhibit 2 are said to be exact copies of the original invoices and made at the same time on the same typewriter. They show price variations without regard to quantity, thereby supporting the affiant's allegations of bargaining.

It has been held that a price obtained for merchandise by negotiation (*Arthur J. Humphreys* v. *United States*, 57 Cust. Ct. 638, Reap. Dec. 11225, not appealed) or by *bargaining* is *not* evidence of a statutory value (*Harry Garbey* v. *United States*, 24 CCPA 48, 52, T.D. 48332, and *Semon Bache & Co.* v. *United States*, 28 CCPA 166, 176, C.A.D. 140).

Under the record herein, insofar as foreign value is concerned, it is clear that neither a statutory foreign value for such (Degussa's) thiourea, nor a statutory foreign value for similar (Trostberg's) thiourea, existed in West Germany during 1961 and 1962, the period of time here involved.

With reference to export value the evidence shows that Millmaster was an exclusive United States purchaser from Degussa during said period (stipulation of counsel, R. 4, and contract, exhibit 1). According to the knowledge, information, and belief of Annemarie Killius, "Trostberg" was the only other producer of thiourea during that period. It further appears that neither "Trostberg" nor any other manufacturer in West Germany offered for sale or sold thiourea to

United States purchasers on a regular commercial basis in wholesale quantities during the period involved (exhibits 2 and 6). According to the affidavit of Schulte, "Trostberg," by which he had been employed as sales and export manager since 1960, did not offer or freely sell thiourea "to purchasers in the USA on a regular commercial basis. We have had arrangements which excluded the free sale or offer for sale in the US-market" (exhibit 7). The foregoing evidence, at least in part, fairly indicates a lack of free sales or offers for sale of such or similar thiourea during 1961 and 1962 to all United States purchasers by the only sellers or producers of that product in West Germany. Hence, a statutory export value did not exist in West Germany in 1961 and 1962.

The final question for consideration is whether the evidence introduced by the plaintiffs relating to United States value establishes that basis for valuation pursuant to the statute. In an attempt to meet that burden, plaintiffs introduced evidence, in the nature of a stipulation of counsel, testimony of Dixon, and certain exhibits, which in substance is as follows:

The stipulation of counsel has been shown in substance, *supra*, and need not here be again reviewed.

Dixon testified that he prepared exhibit 5 which is allegedly based on the books and accounts kept by plaintiffs. He stated that he did not *believe* it feasible to derive the general expenses per pound of thiourea or the profit per pound on thiourea in any fashion other than as stated in exhibit 3, "Because no separate books or records were kept for the sale of thiourea products itself" (R. 14, 15). He stated that during 1961 and 1962, Millmaster handled approximately five or six products (R. 14).

Based upon his familiarity with Millmaster's operations, it was Dixon's *estimation* that the cost of selling each product handled by Millmaster was *approximately* the same per dollar of overall sales (R. 14) ; that the profit per dollar of sales was *approximately* the same for each product handled by plaintiffs; that thiourea represented approximately 70 percent of the total sales during 1961 and 1962 (R. 15). He *believed* that the method utilized in deriving the general operating expenses and the profit, as shown on exhibit 3, was a reasonable and logical method because of the nature of the business as each product sold by Millmaster yielded *approximately* the same percentage of gross profit; that the result yielded was *approximately* the same as the effort that went into each product; that the effort that went into thiourea was much greater, and represented a greater amount of sales, and that the operating expenses per dollar of sales were *approximately* the same for each product; that, in his *estimation*, the ratio for oper-

ating expenses for each product was the same as was the ratio for net profit (R. 15, 16). Dixon also testified that, while he was employed by Schillig, he worked on the books of other clients, some being the same size as Millmaster, that purchased and sold multiple products. He stated (R. 17), "I never ran into a case where separate books were kept for each product." He *believed* it would be too expensive to maintain separate books by companies the size of Millmaster (R. 18).

Under cross-examination, Dixon conceded that Millmaster's books and records do not indicate what part, if any, of the amounts listed on exhibit 5 under the heading of "Schedule of Operating Expenses" are specifically or directly chargeable to the purchase, receipt, and sale of the merchandise before the court, thiourea. He also testified that it is reasonable and possible to conclude that some of the amounts listed in exhibit 5 under "Schedule of Operating Expenses" *may not be applicable at all to the purchase, receipt, and sale of thiourea*, but that "it is not readily ascertainable" from the type of books kept by Millmaster; that he *believed*, "upon thorough investigation" of the books kept, he could ascertain whether commissions, professional fees, deductions for interest, and bank charges are directly chargeable to thiourea (R. 18, 19, 22). He thought it possible to set up books which would directly show what expenses were specifically attributable to thiourea, but it would be too expensive for the size of his company; that it was a question of dollars and cents expense (R. 19, 20). He further stated that, while employed by Schillig and working on the books of other corporations, he did *not* certify, but that Schillig did so. He, at that time, did all the work on Millmaster's account prior to certification by Schillig, who assured himself that the work was done according to accounting standards (R. 21).

Under redirect examination, Dixon testified that, if separate books were kept for thiourea, he *believed* that "we would probably come up with the same answer" as indicated for general expenses and profit as "each product yielded *approximately* the same profit for the amount of effort that went into a product. The amount spent was in direct relationship to the amount realized" (R. 23) [emphasis supplied]. He did not *believe* it possible to allocate rent, dues, subscriptions, or contributions to thiourea, and that, in the schedule of operating expenses (exhibit 5), there are items where he cannot make a direct charge to thiourea no matter what kind of books are kept (R. 23, 24).

At the time Dixon testified in 1965, he had only 7 years of accounting experience. He prepared exhibits 3 and 5. The evidence does not show when he left the employ of Schillig or when he became employed by Millmaster. Dixon did not testify that he wrote up the books or supervised their preparation or their maintenance. There is no evidence that those books were correct and certified by a certified public accountant.

Dixon could not so certify for he was not a certified public accountant and was not qualified so to do. When this is considered along with Dixon's testimony as to his *beliefs, estimations, probabilities,* and *approximations,* little, if any, credence can be given to the figures he prepared as reflected in exhibits 3 and 5, especially as no books were *separately* kept for thiourea. His testimony as to the number of products dealt in by Millmaster was also indefinite since he testified they handled "approximately five or six products" (R. 14, 15, 19). It would seem that a person who is the chief accountant should know *precisely* the number of *products* dealt in, especially as they were few in number.

He testified that, if separate books were kept for each product, he *believed* "we would probably come up with the same answer" (R. 23). This is mere conjecture. His testimony that he never ran into a case where separate books were kept for each product (R. 17) is without evidentiary value as there is no showing that he had access to the books of any other particular client or number of clients of Schillig's or his own, if any, or the number of products such firm or firms may have dealt in. There is no showing of the amount of expense necessary to maintain separate books for the five or six products dealt in by Millmaster. His testimony that *about* or *approximately* 70 percent represented the sale for thiourea of all sales (R. 15, 19) is also an indefinite assumption which cannot be supported or verified by the books kept by Millmaster.

In *Alex Schechter Corp.* v. *United States,* 3 Cust. Ct. 586, 587, Reap. Dec. 4657, cited by plaintiffs, the court derived the elements of general expenses and profit from the operating expenses of the corporation utilizing a percentage basis, relying upon the statement that "counsel seem to have agreed that the general expenses and profit made by the plaintiff corporation on merchandise such as that in issue may be used as a basis." Here, there is no such understanding. On the contrary, defendant reserved its right to object and strongly urges in its brief, page 22, against accepting the method of arriving at general expenses and profit by an *approximate* percentage of 70 percent of the total sales of "a group of unidentified commodities, amongst which the particular commodity 'the merchandise involved' is only an unascertainable unit of a conglomerate mass of six or more unseparated, anonymous commodities."

In *United States* v. *Alex Schechter Corp.,* 25 CCPA 107, T.D. 49240, the Government conceded that, if the importer was entitled to deductions for general expenses and profit, then it was 4.3 per centum and 8 per centum respectively. There the only question was whether the imported rabbit skins, the only kind imported and dealt in by the importer, were "purchased goods" or were obtained otherwise than

by purchase under the United States value statute. There was no question concerning multiple products. In the case at bar, there is no similar concession.

In *Judson Sheldon International Corporation* v. *United States*, 51 Cust. Ct. 374, 379, Reap. Dec. 10586, the trial court was not satisfied that the evidence as to general expenses and profit was sufficient to support plaintiff's claimed values. No separate books were kept covering the general expenses and profit as applied to the imported merchandise. The testimony related to records kept as to sales of all types of merchandise sold by the company. It was, therefore, necessary to assume that the same amount of profit proportionately was derived from the sale of the imported merchandise as from the sale of other merchandise. The same situation applied in determining general expenses. The court stated that such method was not satisfactory proof and that plaintiff failed in its proof on the question of those two items. The Appellate Term, Second Division, in 54 Cust. Ct. 773, 778, A.R.D. 183, affirmed, citing *United States* v. *Henry Maier*, 21 CCPA 41, T.D. 46378, which held—

\* \* \* that the phrase "usual general expenses \* \* \* in the case of such or similar merchandise" refers *not* to a percentage of the total turnover of all goods sold by a manufacturer, but to the usual general expenses incurred only in the production of such or similar merchandise. Obviously, this is a repudiation of any accounting legerdemain which purports to allocate to the segment of a seller's operations relating to merchandise of the kind undergoing appraisement a proportionate share of the total general expenses when such seller handles several different kinds of articles. [Emphasis supplied.]

Note also *Hill Brown Corp* v. *United States*, 53 Cust. Ct. 412, Reap. Dec. 10823, affirmed 55 Cust. Ct. 771, A.R.D. 198, now pending appeal in court of appeals, Appeal No. 5235.

An examination of the evidence in the case at bar relating to United States value leads to the conclusion that such evidence falls far short of making out a *prima facie* case for appraisement of the imported thiourea on the basis of United States value. At most, the evidence is speculative, indefinite, uncertain, and nebulous. Such evidence cannot be accepted in lieu of satisfactory probative substantial and direct evidence which is essential in order to establish a statutory United States value.

On the record, plaintiffs have failed to affirmatively establish a statutory value different from the appraised foreign value. It follows, therefore, that, although the basis for appraisement, foreign value, has been shown to be erroneous, said appraised value must remain in full force and effect in the absence of proof of any other value. *Kobe Import Co.* v. *United States*, 42 CCPA 194, 198, C.A.D. 593.

On the record herein, I find the following facts:

1. The merchandise covered by these 60 consolidated appeals for reappraisement consists of an industrial chemical invoiced as "THIOUREA chem. pure" which was exported from West Germany to plaintiffs during 1961 and 1962 by the manufacturer-exporter known by the abbreviated name of "Degussa." The plaintiffs were the exclusive United States importers.

2. Thiourea is specified on the final list published by the Secretary of the Treasury in 93 Treas. Dec. 14, T.D. 54521, as required by the Customs Simplification Act of 1956, 91 Treas. Dec. 295, T.D. 54165.

3. Appraisement was made at deutsche marks 3.25 per kilo, net, packed, in all appeals, on the basis of foreign value as defined in section 402a(c) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, 74 Treas. Dec. 17, T.D. 49646, and as redesignated in the Customs Simplification Act of 1956, *supra*.

4. Plaintiffs claim that there was no foreign value or export value under section 402a (c) or (d) and that United States value, section 402a(e), is the proper basis for appraisement at values stated in exhibit 3.

5. The evidence shows that such or similar thiourea was not freely offered for sale or sold for home consumption in West Germany or freely offered for sale or sold for exportation to the United States during 1961 and 1962 by Degussa or by the only other producer in West Germany referred to as "Trostberg."

6. The evidence shows that plaintiffs arrived at their claimed United States value by a method of calculation based upon percentages of total or overall sales or operations of five or six products which percentages allegedly reflected the elements of general expenses and profit applicable to thiourea on the basis of *approximately* 70 percent of total overall sales.

7. Oral evidence relating to United States value is based in part upon beliefs, estimations, approximations, and probabilities.

On the record herein, I conclude as matters of law:

1. There was no foreign value, export value, or United States value, section 402a (c), (d), or (e) of the Tariff Act of 1930, or as amended· by the Customs Administrative Act of 1938 and as redesignated by the Customs Simplification Act of 1956, for such or similar thiourea exported from West Germany during 1961 and 1962.

2. Plaintiffs have not established any statutory value for the imported thiourea different from the appraised value.

3. The appraised value remains in full force and effect in each of the 60 consolidated appeals. *Kobe Import Co.* v. *United States*, 42 CCPA 194, C.A.D. 593.

Judgment will be entered accordingly.